## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

CHARLES KEPPEL, JR,

     Plaintiff,

v.                                          Case No. 8:20-cv-3003-KKM-TGW

CHRISTOPHER NOCCO, JEFFREY
HARRINGTON, STACY JENKINS,
and JOHN COLLIER,

     Defendants.

_____/

## <u>ORDER</u>

Plaintiff Charles Keppel, Jr., resigned from the Pasco County Sheriff's Office and now brings Racketeer Influenced and Corrupt Organizations Act (RICO) and constitutional claims against his former supervisors. But his efforts are unsuccessful. Instead, Keppel's Amended Complaint constitutes an impermissible shotgun pleading and, in the alternative, fails to state a claim upon which relief can be granted. As a result, the Court grants Defendants' motion to dismiss (Doc. 19), dismisses Keppel's Amended Complaint with prejudice, and directs the clerk to enter judgment in Defendants' favor.

### I.  Procedural History

Like the other related cases in this saga, the history of this litigation is both protracted and procedurally painful, yet with little advancement on the merits. On April

16, 2019, Christopher J. Squitieri and two other plaintiffs filed a complaint against fifteen defendants, all of whom were current or former employees of the Pasco County Sheriff's Office ("Squitieri litigation"), alleging a civil RICO and state law claim. *See Squitieri v. Nocco*, 8:19-cv-0906-KKM-AAS. A couple months later, an amended complaint was filed in the case; it named twenty plaintiffs—including Keppel—and forty-five defendants. After receiving leave from the Court (at that time, the case was before the Honorable Charlene Honeywell), the Squitieri litigation plaintiffs filed a second amended complaint on August 7, 2019. Defendants moved to dismiss plaintiffs' second amended complaint less than a week later. During a hearing on defendants' motion to dismiss, Judge Honeywell step-by-step explained the deficiencies remaining in the plaintiffs' pleading and orally granted-in-part defendants' motion to dismiss the second amended complaint and directed plaintiffs to file a third amended complaint that complied with the Federal Rules of Civil Procedure. The Squitieri litigation plaintiffs filed a third amended complaint, which the defendants again moved to dismiss.

After entering an order to show cause and considering plaintiffs' response, Judge Honeywell severed the Squitieri litigation claims and ordered plaintiffs to pursue their claims in separate actions against the appropriate defendants by December 16, 2020.

Keppel initiated this action by filing a complaint against Defendants Christopher Nocco, Jeffrey Harrington, Stacy Jenkins, and John Collier. (Doc. 1.) Keppel then filed an

2

Amended Complaint on February 19, 2021, alleging a civil RICO claim (Count I) and various constitutional violations (Count II). (Doc. 15.) Defendants move to dismiss the Amended Complaint as a shotgun pleading and for failure to adequately plead RICO and constitutional claims. (Doc. 19.) Keppel opposes the motion to dismiss (Doc. 23), and the Court stayed discovery pending the resolution of the motion to dismiss (Doc. 24).

## II.     Factual Background

Keppel's Amended Complaint describes his opposition to one of the Sheriff's Office's programs, statements he made on social media, directions he gave to subordinates, investigations from the Defendants into Keppel, and his ultimate termination from the Sheriff's Office.

First, Keppel describes the "Intelligence Led Policing" (ILP) program that the Sheriff's Office had implemented. Keppel alleges the ILP program was instituted by the Sheriff's Office in 2011 and is unconstitutional, "target[ing] those deemed to be 'prolific offenders,'" and instructing law enforcement "to focus [their] efforts on those criminals who [they] have reason to believe are frequent or prolific offenders." (Doc. 15 at ¶¶ 16, 18.) "The major problem with the ILP practices," Keppel alleges, is that they rest on the notion that "[s]peed is critical to success and bureaucratic processes that delay implementation must be overcome"—even if those "bureaucratic processes" "are the fundamental constitutional considerations of 'probable cause' and the many other

constitutional protections that apply to all citizens in a free society." (*Id.* at ¶ 19.) Keppel directed "his deputies to ignore the directive of the Intelligence Led Policing [program] to harass alleged prolific offenders." (*Id.* at ¶ 24.) Because Keppel did not "play[] along" and "enforc[e] the unconstitutional dimensions and components of the ILP Program against innocent citizens of Pasco County," Defendants retaliated against him with "baseless internal departmental investigations intended to ruin [his] career." (*Id.* at ¶¶ 21–22.)

The first Internal Affairs Complaint was filed against Keppel for "allegedly mocking Defendants" Collier and Jenkins on Facebook. (*Id.* at ¶ 28.) Earlier in his Amended Complaint, Keppel admitted that he had "made a post on Facebook[] venting about his Commanding Staff Supervisors," (*id.* at ¶ 25) but contends that he "did not mention any particular individuals" as the Internal Affairs Complaint claimed he did, (*id.* at ¶ 28). Instead, Keppel alleges that the first Internal Affairs Complaint was filed as a retaliatory measure against Keppel for arresting a suspect when Defendant Collier "instructed [Keppel's] deputy not to arrest" the suspect and in retaliation for Keppel's "reluctance [to] blindly following the Department[']s ILP program." (*Id.* at ¶¶ 26, 29.)

The second Internal Affairs Complaint was filed because Keppel allegedly disobeyed Defendants Jenkins and Collier when he sent "his squad their stats." (*Id.* at ¶ 30.) Keppel claims that "he was not the person that released the stats, some else did."

(*Id.*) The third Internal Affairs Complaint was filed "for alleged careless disregard," and resulted in Keppel being fired. (*Id.* at ¶ 32.)

Keppel alleges that "due to the Pasco [County] Sheriff's Office's false Internal Affairs Complaints and the negative references provided from [the] Pasco [County] Sheriff's Offices Human Resources" department, Keppel was denied employment at eight police departments. (*Id.* at ¶ 34.)

## III.   Analysis

### a.   Shotgun Pleading

Defendants first argue that the Amended Complaint should be dismissed as an impermissible shotgun pleading. (Doc. 19 at 4.) The Court concurs.

#### i.   Legal Standard

A shotgun pleading is any pleading which "fail[s] to one degree or another . . . to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015). Although shotgun pleadings can take many forms, the Eleventh Circuit has identified four "rough types" or categories of shotgun complaints. *Id.* at 1321–23. First, the most common type contains "multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint." *Id.* at 1321 (footnote omitted). The

5

second type of shotgun pleading is "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action." *Id.* at 1321–22 (footnote omitted). "The third type of shotgun pleading is one that commits the sin of not separating into a different count each cause of action or claim for relief." *Id.* at 1322–23 (footnote omitted). "Fourth, and finally, there is the relatively rare sin of asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *Id.* (footnote omitted). "The unifying characteristic of all types of shotgun pleadings is that they fail . . . to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Id.* (footnote omitted). And they violate the Federal Rules of Civil Procedure, most notably Rules 8 and 10.

## ii. Analysis

Keppel's Amended Complaint "commits the sin of not separating into a different count each cause of action or claim for relief." *Id.* at 1322–23 (footnote omitted). Keppel received notice of pleading deficiencies once the amended complaint[1] was filed in the Squitieri litigation in 2019. Indeed, at a hearing on the defendants' motion to dismiss the second amended complaint in the Squitieri litigation, Keppel's attorney, the same counsel as in the Squitieri litigation and in this case and the signatory of Keppel's Amended

---

[1] Keppel joined as a plaintiff in the amended complaint filed in the Squitieri litigation.

Complaint here, admitted that the second amended complaint was "poorly drafted." *Squitieri v. Nocco*, 8:19-cv-0906-KKM-AAS, (Doc. 171 at 7). In the same hearing, Judge Honeywell opined that "the complaint [was] so poorly drafted" that she could not "even get to the merits of it" and that the amended complaint was "absolutely" a "shotgun pleading"; "there [was] no mistake about it." (*Id.* at 6, 8.) Despite these judicial warnings and multiple motions to dismiss in the Squitieri litigation that highlighted the complaints' shortfalls, the deficiencies remained in Keppel's three Squitieri litigation complaints and two complaints in this case. Rather than correct the deficiencies, Keppel persisted in submitting poorly drafted pleadings by copying and pasting numerous paragraphs from previous iterations of the Squitieri litigation complaints and his first complaint in this case into his Amended Complaint that is now before the Court.

In Count II of his Amended Complaint, Keppel improperly lumps together a variety of constitutional violations.[2] (*See* Doc. 15 at ¶¶ 41–46.) Keppel alleges that "Defendants, in their official capacities, punished [Keppel] for exercising his First Amendment rights," (*id.* at ¶ 43); that Defendant Nocco took "a valuable property right protected by the Constitution" away from Keppel (his job), (*id.* at ¶ 44); that Defendants "abridged and restrained [Keppel's] right to free speech as guaranteed by the Florida . . . Constitution,"

---

[2] Count I of Keppel's Amended Complaint also alleges multiple claims. Specifically, he alleges both federal and state RICO claims. (Doc. 15 at ¶ 40 (alleging violations of 18 U.S.C. § 1961 and section 895.02(8)(b) of the Florida Statutes).)

(*id.* at ¶ 45); that Defendants "denied [Keppel] equal protection of the law," (*id.*); and that Defendants' conduct "constitutes an unlawful and unauthorized taking of [Keppel's] job via forced resignation, his 'private property,' without just compensation, without due process of law, and without a public purpose, in violation of the [Fifth] Amendment," (*id.*). In the six paragraphs that comprise Count II, Keppel appears to allege violations of his First, Fifth, and Fourteenth Amendment rights, as well as right to free speech under the Florida Constitution. (*See id.* at ¶¶ 41–46.) Of course, his earlier allegation in the Amended Complaint listed "the Fourth, Fifth, and Fourteenth Amendment[s]." (*See id.* at ¶ 2 (without mentioning the First Amendment).) "[W]here a plaintiff asserts multiple claims for relief, a properly drafted pleading 'will present each claim for relief in a separate count.'" *Marlborough Holdings Grp., Ltd. v. Azimut-Benetti, Spa, Platinum Yacht Collection No. Two, Inc.*, 505 F. App'x 899, 907 (11th Cir. 2013) (quoting *Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996)). The failure to separate each claim for relief into a different count, as required by Rule 10(b), is a hallmark of a shotgun pleading and makes it "virtually impossible to know which allegations of fact are intended to support which claim(s) for relief." *Anderson*, 77 F.3d at 366; *see Barmapov*, 986 F.3d at 1325. Accordingly, the Court dismisses Keppel's Amended Complaint as an impermissible shotgun pleading.

## IV.   Failure to State a Claim under Rule 12(b)(6)

In the alternative, Defendants argue that Keppel's claims—the RICO and constitutional claims—fail to state a claim upon which relief may be granted. (Doc. 19 at 7–22.) Again, the Court agrees.

### a.  Legal Standards

#### i.  Rule 12(b)(6) Standard

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient facts to state a claim that is "plausible on its face." *Iqbal*, 556 U.S. at 678 (citation omitted). A claim is plausible on its face when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id.*

When considering the motion, the court accepts all factual allegations of the complaint as true and construes them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008) (citation omitted). Courts should limit their "consideration to the well-pleaded factual allegations, documents central to or

referenced in the complaint, and matters judicially noticed." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004) (citations omitted).

### ii.  Federal RICO Claim

The Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968, provides a private right of action for treble damages to "[a]ny person injured in his business or property by reason of a violation" of the Act's criminal prohibitions. § 1964(c); *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 641 (2008). To state a prima facie civil RICO claim under § 1964(c), a plaintiff must establish "three essential elements: first, that the defendant[s] committed a pattern of RICO predicate acts under 18 U.S.C. § 1962; second, that the plaintiff suffered injury to business or property; and, finally, that the defendant[s'] racketeering activity proximately caused the injury." *Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 705 (11th Cir. 2014) (citations and punctuation omitted). Failing to adequately plead any one of these elements warrants dismissal of the plaintiff's complaint for failure to state a claim upon which relief may be granted. *See Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1211 (11th Cir. 2020).

To allege a pattern of predicate acts, a plaintiff must "show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). Continued criminal activity, or "continuity," can be shown through either a "closed period of repeated conduct" (closed-ended continuity) or "past conduct that by its nature projects into the future with

a threat of repetition" (open-ended continuity). *Id.* at 241. Closed-ended continuity can be alleged when the allegations show a "series of related predicates extending over a substantial period of time." *Id.* at 242. To allege predicates extending over a substantial period of time, a plaintiff must allege at least a period of nine months, although any "scheme[] lasting less than a year" may be too insubstantial. *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1266 (11th Cir. 2004). Open-ended continuity can be shown through a "threat of continued racketeering activity." *H.J. Inc.*, 492 U.S at 242.

## 1. Predicate Acts

An act of racketeering activity, commonly known as a "predicate act," is statutorily defined and includes a long list of state and federal crimes. *See* 18 U.S.C. § 1961(1). In order to be a predicate act, the act must be indictable under a variety of federal statutes or constitute an "act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical" which is chargeable under state law.[3] *Id.* Keppel alleges that Defendants have "engaged in a pattern and practice, through the Pasco [County] Sheriff's Office, of engaging in 'racketeering activity'" through the following predicate acts: (1) tampering with a witness, victim, or informant under 18 U.S.C. § 1512(b)(2)(A)[4]; (2) retaliating against a

---

[3] Section 1961(1) also provides several other ways of alleging a predicate act which are irrelevant here.

[4] Although Keppel's Amended Complaint does not specify which provision of § 1512 he alleges that the Defendants violated, he quotes exclusively from § 1512(b)(2)(A) and only addresses the elements of that provision in alleging the violation of § 1512. Given Keppel's focus on § 1512(b)(2)(A), the Court assumes that is the only provision of § 1512 Keppel intended to plead.

witness, victim, or an informant under § 1513(e); (3) mail fraud under § 1341; (4) wire fraud under § 1343; (5) tampering with a witness, victim, or informant under section 914.22 of the Florida Statutes; and (6) retaliating against a witness, victim, or informant under section 914.23 of the Florida Statutes.  (Doc. 15 at ¶¶ 12, 37–40.)

"A plaintiff must put forward enough facts with respect to each predicate act to make it independently indictable as a crime." *Cisneros*, 972 F.3d at 1215. Keppel fails to plead any predicate acts under 18 U.S.C. § 1961(1).

### a.  Keppel fails to plead a violation of either 18 U.S.C. §§ 1512 or 1513.

Keppel alleges that Defendants violated 18 U.S.C. § 1512(b) (tampering with a witness, victim, or an informant) and § 1513(e) (retaliating against a witness, victim, or informant) as predicate acts under § 1961(1). But § 1512(b) prohibits interference with those testifying in an "official proceeding" or interfering with certain communications to a "law enforcement officer or judge of the United States" and § 1513(e) prohibits retaliating against a person for providing information about a Federal offense to a "law enforcement officer." Keppel has not alleged any participation in an official proceeding or that he provided information about a Federal offense to a law enforcement officer, as "official proceeding" and "law enforcement officer" are statutorily defined.

Section 1512(b) subjects anyone to fine, imprisonment, or both who knowingly uses—or attempts to use—intimidation, threats, or persuasion to influence, delay, or

prevent the testimony of any person in an official proceeding or who "hinder[s], delay[s], or prevent[s] the communication to a law enforcement officer or judge of the United States" information related to a Federal offense or violations of postconviction release agreements. Section 1513(e), for its part, prohibits retaliation against a person who attends an official proceeding or provides information related to a Federal offense to a "law enforcement officer." The statute defines "official proceeding" as either (A) "a proceeding before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury"; (B) "a proceeding before the Congress"; (C) "a proceeding before a Federal Government agency which is authorized by law"; or (D) "a proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce." 18 U.S.C. § 1515(a)(1). And "law enforcement officer" is defined as "an officer or employee of the Federal Government, or a person authorized to act for or on behalf of the Federal Government or serving the Federal Government as an adviser or consultant." § 1515(a)(4).

Keppel alleges that one of his deputies was battered and instructed to "withhold his official statement and records" and not to arrest the person who battered him but that,

notwithstanding that instruction, Keppel (with his deputy) went and arrested the person. (Doc. 15 at ¶¶ 26, 37.) Keppel claims that violating this order "resulted in a chain of harassment which led to a forced resignation." (*Id.* at ¶ 37.) He also alleges that he told his deputies not to follow the ILP program. (*Id.* at ¶ 24.) And Keppel claims he made a post on Facebook that "vent[ed] about his Commanding Staff Supervisors harassing him." (*Id.* at ¶ 25.) None of these implicate an official proceeding as defined in 18 U.S.C. § 1515(a)(1), meaning Keppel's claim for intimidation under § 1512(b) fails.

Further, Keppel's claim under § 1513(e) fails because Keppel has not alleged that he gave information related to a possible commission of a Federal offense to any law enforcement officer. Keppel does not allege the battery on his deputy was a Federal offense, but—assuming it constituted a Federal offense—Keppel does not allege anywhere that he communicated information about the offense to "an officer or employee of the Federal Government" or a person authorized to act for the Federal Government or a person serving the Federal Government as "an adviser or consultant." § 1515(a)(4). Lacking any such allegation, Keppel cannot claim he was retaliated against for giving information to a law enforcement officer about a Federal offense under § 1513(e).

### b. Keppel fails to plead a violation of either 18 U.S.C. §§ 1341 or 1343.

Keppel alleges that the Defendants violated 18 U.S.C. §§ 1341 and 1343 by creating the Internal Affairs Complaints "as a scheme, under false pretenses, to harass [Keppel] to

force him to resign or create grounds for a dismissal" and "as all documents . . . were transmitted either by mail or electronic means . . . to the . . . [other] police and sheriff's departments."[5] (Doc. 15 at ¶¶ 38, 39.)

To establish liability under the federal mail and wire fraud statutes, a plaintiff must prove: "(1) that defendants knowingly devised or participated in a scheme to defraud plaintiffs, (2) that they did so willingly with an intent to defraud, and (3) that the defendants used the U.S. mails or the interstate wires for the purpose of executing the scheme." *Langford v. Rite Aid of Alabama, Inc.*, 231 F.3d 1308, 1312 (11th Cir. 2000) (citation omitted). The scheme to defraud must seek to defraud the victim of "money or property." *Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020). Finally, when alleging fraud, "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. Proc. 9(b). Particularity under Rule 9(b) requires that a plaintiff plead "'facts as to time, place, and substance of the defendant's alleged fraud,' specifically 'the details of the defendant['s] allegedly fraudulent acts, when they occurred, and who engaged in them.'" *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1357 (11th Cir. 2006) (alteration in original) (quoting *U.S. ex rel. Clausen v. Lab'y Corp. of Am.*, 290 F.3d 1301, 1310 (11th Cir. 2002)). Rule 9(b)'s particularity requirement "serves an important purpose in fraud

---

[5] The Amended Complaint actually alleges that the Defendants' scheme was to harass "the Defendant to force him to resign or create grounds for a dismissal." (Doc. 15 at ¶ 38.) Keppel clearly intended to allege that the Defendants were harassing *him*, not one of the Defendants, so the Court will evaluate this allegation under that assumption.

actions by alerting defendants to the 'precise misconduct with which they are charged' and protecting defendants 'against spurious charges of immoral and fraudulent behavior.'" *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988) (quotation omitted).

Keppel fails to sufficiently allege that the Defendants violated the mail or wire fraud statutes. The Court takes a generous reading of the Amended Complaint, yet still concludes that Keppel fails to allege fraud with the particularity required by Rule 9(b) and that, even had he alleged the fraud with sufficient particularity, he also fails to allege that the scheme was to deprive Keppel of a protected property interest.

First, Rule 9(b) requires a plaintiff plead with specificity "the details of the defendant['s] allegedly fraudulent acts." *McInteer*, 470 F.3d at 1357 (quotation omitted). Keppel fails to allege fraud with the particularity required by Rule 9(b). Keppel alleges that the Defendants "subjected [him] to three . . . false and retaliatory Internal Affairs Complaints" and that the complaints caused other potential employers not to hire him. (Doc. 15 at ¶¶ 27, 34.) Here, Keppel's allegations that the Defendants "subjected" him to false and retaliatory complaints fail to specify (1) who authored the statements; (2) how they were provided to other potential employers; and (3) when they were provided.[6]

---

[6] The Court also notes that Keppel only barely alleges what in the Internal Affairs Complaints were false. *See Neder v. United States*, 527 U.S. 1, 25 (1999) (interpreting the mail and wire fraud statutes to require that the falsehood in the scheme to defraud be material). Keppel makes conclusory allegations that all of the Internal Affairs Complaints were false, but he fails to provide facts that make most of the allegations plausible. (Doc. 15 at ¶ 27.) The first Internal Affairs Complaint charged Keppel with "mocking"

Specifically, for example, Keppel never explains whether the Defendants actually wrote and filed the complaints, or if they misrepresented facts to coworkers, leading those coworkers to file complaints. Keppel alleges that the first two Internal Affairs Complaints were filed because he allegedly mocked Defendants Collier and Jenkins on social media and later disobeyed them. (*Id.* at ¶¶ 28, 30.) But this just describes the topic of the Internal Affairs Complaints and fails to clarify what role the Defendants had in creating them.

Keppel also fails to identify which Defendants engaged in which conduct. In alleging that the Defendants retaliated against him with "baseless internal departmental investigations" and "subjected [him] to three . . . false . . . Internal Affairs Complaints," (Doc. 15 at ¶¶ 22, 27), Keppel fails to specify which Defendant committed which actions. And Keppel's failure to identify how the Defendants "subjected" him to false Internal Affairs Complaints, coupled with his failure to identify which Defendant committed which actions, prevents Keppel's Amended Complaint from alleging with particularity who

---

Defendants Collier and Jenkins on Facebook. (*Id.* at ¶ 28.) Keppel responds that his "posts did not mention any particular individuals," impliedly conceding that the posts existed and merely disputing whether he could be blamed for "mocking" the Defendants. (*Id.*) But a concession that the post exists undermines the Court's ability to infer that the first Internal Affairs Complaint contained a falsehood. The third Internal Affairs Complaint was for Keppel's "alleged careless disregard." (*Id.* at ¶ 32.) While none of Keppel's allegations implies that he was guilty of careless disregard, he also fails to supply any facts from which the Court can reasonably infer that he was not guilty of careless disregard. In describing the second Internal Affairs Complaint, however, Keppel sufficiently identifies the falsehood. The complaint charged Keppel with disobeying Defendants Collier and Jenkins by "sending his squad their stats." (*Id.* at ¶ 30.) Keppel responds that "he was not the person that released the stats, someone else did," specifying with sufficient precision that the falsehood was the proposition that Keppel was responsible for releasing the stats. (*Id.*) So he satisfies Rule 9(b)'s requirement to identify the specific falsity in one of the three Internal Affairs Complaints.

committed what fraudulent conduct. The closest he comes to alleging particular conduct is alleging that the first two Internal Affairs Complaints alleged Keppel mocked Defendants Collier and Jenkins on Facebook and later disobeyed them. (*Id.* at ¶¶ 27, 30.) But these allegations only further confuse who Keppel alleges committed which actions. He elsewhere alleges that the Defendants all subjected him to the Internal Affairs Complaints, (*id.* at ¶ 27), and he does not allege that Defendants Collier and Jenkins were particularly or exclusively responsible for the first two Internal Affairs Complaints. The other two Defendants, Nocco and Harrington, are thus left to guess whether Keppel alleges they were responsible for these two complaints or if—contrary to his allegation that all the Defendants subjected him to three Internal Affairs Complaints, (*id.* at ¶ 27)—only Defendants Collier and Jenkins were responsible. Finally, Keppel's allegation that "[t]he Defendants false Internal Affairs Complaints were created and pursued as a scheme," (*id.* at ¶ 38), fails to identify *who* created them—a mere implied possessive does not indicate how the Defendants were responsible for the Internal Affairs Complaints.

To be sure, not all group pleading or "lumping" of defendants—where a plaintiff merely pleads that the defendants, or a group of defendants, committed an act—is impermissible under Rule 9(b). *See Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1274 (11th Cir. 2019); *Barmapov v. Amuial*, 986 F.3d 1321, 1331 n.6 (11th Cir. 2021) (Tjoflat, J., concurring). But when alleging that a group

of defendants committed a certain action, a plaintiff must still give fair notice to each of the defendants regarding what conduct they are alleged to have committed. *See Quality Auto Painting Ctr. of Roselle, Inc.*, 917 F.3d at 1275. If Keppel had alleged with particularity how the Defendants "subjected" him to these Internal Affairs Complaints, lumping the Defendants together might have been sufficient to give fair notice. But Keppel, in failing to identify which specific conduct subjected him to the Internal Affairs Complaints nor which Defendant was responsible for that conduct, fails to give the Defendants fair notice of what fraudulent conduct they each allegedly committed.

Finally, Keppel does not allege when the Defendants "subjected" him to the Internal Affairs Complaints. *See McInteer*, 470 F.3d at 1357. He alleges that he was an employee at the Pasco County Sheriff's Office from October 1997 through January 2016, (Doc. 15 at ¶ 23), but he does not specify when any of the fraudulent acts occurred. Lacking any specifics as to how the Defendants subjected Keppel to fraudulent Internal Affairs Complaints or what role each Defendant played in such subjection, the Defendants may have still attempted to understand the allegations against them by considering what they were doing when the alleged fraud was supposed to have taken place. But Keppel's Amended Complaint fails to allege when they committed the fraudulent acts, leaving them unable to determine what actions Keppel alleges they each committed.

19

Even if Keppel had succeeded in meeting the requirements of Rule 9(b), Keppel would also fail to allege the substantive elements of mail or wire fraud. Keppel claims that the Defendants "devised or participated in a scheme to defraud" when he alleges that they "engaged in . . . defamation" when he "exhibited any resistance" to the ILP program. (Doc. 15 at ¶ 21.) Although he does not allege that the Defendants intended to obtain money or property through their retaliatory scheme to defraud, he does allege that they "intended to ruin [his] career and prevent[] him from gaining employment with any other law enforcement agency." (*Id.* at ¶ 22.) Since neither the Eleventh Circuit nor the Supreme Court have clearly answered whether a scheme where a perpetrator intends to deprive a victim of property but does not intend to gain that property himself is sufficient as a "scheme to defraud," the Court assumes it does. *Compare Kelly*, 140 S. Ct. at 1571 (noting that § 1343 prohibits "only deceptive 'schemes to deprive [the victim of] money or property'" (quotation omitted) (alteration in original)), *with United States v. Bradley*, 644 F.3d 1213, 1240 (11th Cir. 2011) ("To gauge a defendant's intent to commit a fraudulent scheme, then, we must determine whether the defendant attempted to *obtain*, by deceptive means, something to which he was not entitled." (emphasis added)).

But Keppel fails to identify any authority that indicates future employment is a kind of vested property right or monetary interest protected by the mail and wire fraud statutes, (*see* Docs. 15 and 23), and the Court is skeptical that Keppel is sufficiently entitled to

future employment and benefits to consider it his "property." *See Roitman v. New York City Transit Auth.*, 704 F. Supp. 346, 349 (E.D.N.Y. 1989) ("Plaintiff here has alleged no more than an expectation of employment. He has no property right in this expectation."); *see also Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972) (requiring a plaintiff show he has "a legitimate claim of entitlement" before something is considered a "property interest" under procedural due process). For this reason, in the absence of any argument or caselaw by Keppel to the contrary, he fails to allege a predicate act of mail or wire fraud to support his RICO claim.

Further, Keppel fails to sufficiently allege that the Defendants "used the U.S. mails or the interstate wires for the purpose of executing the scheme." *Id.* The sole allegation in the Amended Complaint related to the mails or interstate wires is Keppel's conclusory allegation that the Internal Affairs Complaints were "transmitt[ed] . . . by mail or electronic means . . . to the above-mentioned police and sheriff's departments." (Doc. 15 at ¶ 39.) Keppel fails to allege any specific facts as to what wires or mails were used or when so employed that make his allegation plausible. Were the Internal Affairs Complaints mailed from one office to another? Were they transmitted over a wire via email, uploaded to the internet, or sent by fax? Nor does Keppel allege any acknowledgement from the police departments that denied him employment indicating that they received these Internal Affairs Complaints. The allegation that the document was "transmitted either by mail or

electronic means" is a mere legal conclusion that is not entitled to the presumption of truth. *Iqbal*, 556 U.S. at 681. At bottom, Keppel fails to allege with particularity that the Defendants committed mail or wire fraud or to allege that he was deprived of any property—the expectation of employment being insufficient—and any facts that would permit a plausible inference that the Internal Affairs Complaints were sent to other potential employers using the mails or wires. Thus, he fails to state any predicate act of mail or wire fraud.

### c. Keppel fails to plead a predicate act under sections 914.22 and 914.23 of the Florida Statutes.

Keppel alleges that the Defendants "engaged in conduct in violation of . . . Fla. Stat. §[§] 914.22 and 914.23, relating to tampering with or harassing a witness, victim, or informant, and retaliation against a witness, victim, or informant."[7] (Doc. 15 at ¶ 40.) Section 914.22 of the Florida Statutes proscribes tampering with a witness or victim and section 914.23 proscribes retaliating against a witness or victim. Because Keppel fails to allege any use of intimidation, threats, bribery, or any official proceeding, he fails to allege a violation of sections 914.22 and 914.23 of the Florida Statutes.

---

[7] The Court assumes that Keppel is not intending to allege violations of these statutes in any way other than as predicate acts for his RICO claim. Under section 914.24 of the Florida Statutes, civil actions can only be brought for violations of sections 914.22 and 914.23 "upon application of the state attorney." *See also Anthony Distributors, Inc. v. Miller Brewing Co.*, 882 F. Supp. 1024, 1034 (M.D. Fla. 1995) (denying compensatory, exemplary, and punitive relief where plaintiff alleged violations of 914.22 and 914.23 because "[n]either statute provides for an award of compensatory damages" and "the state attorney is the party authorized to request [equitable] relief on behalf of the witnesses"). As Keppel is not the state attorney, he cannot bring an action for violations of sections 914.22 and 914.23 of the Florida Statutes absent some civil enforcement mechanism, like RICO.

Section 914.22 of the Florida Statutes proscribes intimidation, threats, or bribery to induce someone to withhold testimony from an official investigation or proceeding and harassment that prevents or dissuades someone from attending or testifying in an official investigation or proceeding. Keppel alleges that Defendant Collier ordered Keppel's subordinate to "withhold his official statement and records" from an investigation into a battery inflicted on the subordinate. (Doc. 15 at ¶¶ 26, 37.) Keppel further alleges that this was "done as an act of intimidation and corrupt persuasion."[8] (*Id.* at ¶ 37.) But Keppel's allegation that the order was given "as an act of intimidation" merely recites an element of the statute without providing any factual support. The Amended Complaint does not allege that Defendant Collier threatened the deputy with disciplinary action, with bodily injury, or other action. Nor does the Amended Complaint state that Defendant Collier looked at the deputy menacingly or in a threatening posture. Instead, the allegation is a legal conclusion that the Court need not accept as true. *See Iqbal*, 556 U.S. at 678.

Keppel also alleges that the Defendants violated section 914.23 by retaliating against a witness, victim, or informant. This section proscribes "caus[ing] bodily injury to another person or damag[ing] the tangible property of another person, or threaten[ing] to do so" as retaliation for a person's attendance or testimony in an official proceeding. Section

---

[8] Neither of these allegations show up in the paragraph where Keppel alleges sections 914.22 and 914.23 were violated. (*See* Doc. 15 at ¶ 40.) Instead, lacking any more of an allegation than the section numbers and the titles of the provisions, the Court relies on the allegations Keppel made to support his claim that the Defendants violated 18 U.S.C. § 1512. (*See id.* at ¶ 37.)

914.21(4), in turn, defines "official proceeding" as a proceeding before a judge, court, grand jury, the legislature, a federal agency authorized by law, or the Commission on Ethics. Keppel does not allege that he attended or gave testimony in any proceeding before the above audiences. Nor does he allege any bodily injury, damage to property, or any threats of such harms. And, without any allegation that the deputy was to participate in a statutorily defined "official proceeding" or that anyone was threatened with or caused bodily injury or damage to property, Keppel's allegation that Defendant Collier instructed Keppel's deputy to "withhold his official statement and records" does not make up the deficiencies in Keppel's section 914.23 allegation.

### 2. Keppel fails to allege a pattern of racketeering activity.

Essential to any RICO claim is the basic requirement of establishing a pattern of racketeering activity that causes injury to the plaintiff. *See Jackson*, 372 F.3d at 1264; *Sanderson Farms*, 744 F.3d at 712. "To successfully allege a pattern of racketeering activity, [a] plaintiff[] must charge that: (1) the defendants committed two or more predicate acts within a ten-year time span; (2) the predicate acts were related to one another; and (3) the predicate acts demonstrated criminal conduct of a *continuing* nature." *Jackson*, 372 F.3d at 1264. To prove "a 'pattern of racketeering activity' it is not sufficient to simply establish two isolated predicate acts." *Id.* Continuity can be alleged by allegations of predicate acts that take place over a substantial period of time (closed-ended) or by alleging a threat of continuity (open-ended). *See H.J. Inc.*, 492 U.S. at 241–42.

The closest that Keppel comes to alleging a predicate act of racketeering activity is his allegations of mail or wire fraud. But even if Keppel successfully alleges predicate acts of mail or wire fraud based on the Defendants sending the Internal Affairs Complaints to other law enforcement agencies, Keppel does not state when any of these transmissions (and thus, when the frauds) occurred. Because Keppel does not allege when the predicate acts occurred, the Court cannot plausibly infer that the predicate acts took place over a substantial period of time. Further, even if Keppel alleged the dates of these predicate acts and those dates showed the predicate acts took place over a substantial period of time, Keppel would likely still fail to allege a closed-ended pattern of racketeering activity because all of those alleged acts would have been taken pursuant to the Defendants' single goal of preventing Keppel from finding future employment with a law enforcement department. And when "RICO allegations concern only a single scheme with a discrete goal, the courts have refused to find a closed-ended pattern of racketeering even when the scheme took place over longer periods of time." *Jackson*, 372 F.3d at 1267. Keppel thus fails to allege a closed-ended pattern of criminal activity.

Keppel also fails to allege facts that would make an open-ended pattern of criminal activity plausible. Specifically, he never alleges "that the illegal acts threatened repetition in the future.'" *Id.* (citation omitted). Keppel pleads that predicate acts of mail or wire fraud occurred when the fraudulent Internal Affairs Complaints that the Defendants "subjected

[Keppel] to" were transmitted to eight other law enforcement agencies. (Doc. 15 at ¶¶ 27, 34, 39.) But Keppel does not allege why these Internal Affairs Complaints were transmitted to the eight police departments that he lists, he does not allege that he will apply to more police departments and that Defendants will continue to send the Internal Affairs Complaints, and does not otherwise allege facts that make it plausible that this "pattern" will continue into the future.

Nor does Keppel allege any facts that allow the Court to reasonably infer that the Defendants' acts threatened repetition as to other victims. Keppel alleges that the Defendants targeted him "and others" when they "would not exhibit undying loyalty to all operational demands the Defendants placed" on them. (*Id.* at ¶ 15.) But this is a conclusory statement not entitled to be presumed true. *Iqbal*, 556 U.S. at 681. And even if the allegation were entitled to the presumption of truth, Keppel still fails to allege how the Defendants acts of targeting others who opposed their operational demands threatened future acts of racketeering. *See Jackson*, 372 F.3d at 1267.

### 3. Keppel fails to allege that his injury was caused by the Defendants' pattern of criminal activity.

Keppel alleges two injuries in his Amended Complaint: his employment with the Pasco County Sheriff's Office was terminated and he was unable to acquire new employment with other police departments. (Doc. 23 at 5 (citing Doc. 15 at ¶ 22).) He alleges the third Internal Affairs Complaint "resulted in him being fired" and that he was

"denied employment due to the . . . false Internal Affairs Complaints." (Doc. 15 at ¶¶ 32, 34.) In alleging he was denied employment *due* to the Internal Affairs Complaints, Keppel alleges that the Defendants' pattern of racketeering activity caused these losses.

To sufficiently allege a civil RICO claim, a plaintiff must allege that he was "injured in his business or property by reason of a violation of section 1962" of the federal RICO statute. 18 U.S.C. § 1964(c). To show that he was injured "by reason of a violation of section 1962," a plaintiff must "plead facts sufficient to give rise to a reasonable inference that the claimed racketeering activity . . . was the but-for *and* proximate cause of the plaintiffs' injuries." *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1349 (11th Cir. 2016) (citation omitted). Proximate causation requires that there be "'some direct relation' between the conduct and the injury to sustain a claim." *Id.* (quoting *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1287–88 (11th Cir. 2006), *abrogated on other grounds as recognized in Simpson v. Sanderson Farms, Inc.*, 744. F.3d 702, 714–15 (11th Cir. 2014)).

Assuming Keppel had sufficiently alleged the predicate acts of mail and wire fraud— the closest predicate acts Keppel comes to alleging—Keppel's Amended Complaint fails to provide any facts supporting an inference that the Defendants' predicate acts were the but- for and proximate cause of his termination from the Pasco County Sheriff's Office or rejection from the other police departments. To start, absent some unpleaded allegation, the Court is unable to see how the other police departments receiving through the mails or

wires the Internal Affairs Complaints from the Pasco County Sheriff's Office caused the Pasco County Sheriff's Office to terminate Keppel's employment.

Further, Keppel's complaint fails to provide sufficient factual allegations that his rejection from the other police departments would not have happened but for those police departments receiving the Internal Affairs Complaints, not to mention what the "direct relation" was between his rejection and the Defendants using the mail or wires to send the Internal Affairs Complaints. The closest Keppel comes to a factual allegation is claiming that he was "denied employment *due to*" the Internal Affairs Complaints. (Doc. 15 at ¶ 34 (emphasis added).) This is merely a conclusory allegation "not entitled to be assumed true." *Iqbal*, 556 U.S. at 681.

And, looking elsewhere in the Amended Complaint, the Court is unable to plausibly infer from the other allegations that his rejections were directly related to the Internal Affairs Complaints or even a but-for cause of the rejections. In his Amended Complaint, Keppel explains that his rejections were caused by both the Internal Affairs Complaints and by "negative references" provided from the Sheriff's Office's Human Resources. (Doc. 15 at ¶ 34.) Keppel does not allege how these references were given, but, because Keppel alleges he was denied employment from these other law enforcement agencies because of both the Internal Affairs Complaints *and* the negative references, the Court infers that the references included more than the Human Resources department

sending the written Internal Affairs Complaints to the other police departments. And if he was rejected at least in part because of the negative references provided by the Human Resources department, then the Human Resources references might have been enough to cause the police departments to deny Keppel employment, undermining the Court's ability to infer that the Internal Affairs Complaints were the but-for and proximate cause of his rejection.[9] And finally, employment decisions are often based on a variety of factors—the mere fact that the police departments received negative information about Keppel from the Pasco County Sheriff's Office does not mean they rejected his application because of it. The Court is not provided with any factual allegations by Keppel to support his conclusory allegation, and the Court will not speculate in the absence of factual allegations.

Further, Keppel fails to sufficiently allege that any future harm from threatened mail or wire fraud from the Defendants will cause him harm. As discussed above, Keppel never alleges that he will apply to police departments in the future, only that he did so in the past. (Doc. 15 at ¶ 34.) And because Keppel fails to sufficiently allege that the Defendants' past

---

[9] Keppel alleges that his rejection from the other police departments was also due to "negative references provided from [the] Pasco [County] Sheriff's Office[']s Human Resources," (Doc. 15 at ¶ 34), but he alleges no predicate act based on such negative references. He alleges violations of 18 U.S.C. § 1343, but only insofar as the wires were used to transmit the "false and fraudulent Internal Affairs Complaints." (Doc. 15 at ¶ 39.) His allegation that the Defendants violated the wire fraud statute when they transmitted the "false and fraudulent Internal Affairs Complaints" cannot be plausibly construed by the Court to refer to his earlier allegation that the Human Resources gave negative references to the other police departments. The references may have been based on the Internal Affairs Complaints, but references do not "transmit[]" the complaints. As the Human Resources references did not constitute a predicate act, they cannot give rise to liability as a but-for or proximate cause of Keppel's rejection from other police departments.

racketeering activities caused his rejection from the other police departments, the Court is likewise unable to "draw the reasonable inference" that future transmissions of the Internal Affairs Complaints by the Defendants to law enforcement agencies that Keppel applies to in the future will be the cause of any denial of employment from those agencies. *Iqbal*, 556 U.S. at 678 (citation omitted).

### 4.   Federal RICO Claim Conclusion

Keppel fails to allege any predicate acts under 18 U.S.C. § 1961(1). Failing to sufficiently allege any predicate acts, Keppel also fails to allege that the Defendants engaged in a pattern of racketeering activity. And lacking either predicate acts or a pattern of predicate acts, Keppel fails to allege any pattern of racketeering that caused his injuries. Keppel's federal civil RICO claim fails.

### iii.   State RICO Claim

Keppel also alleges that Defendants violated Florida's RICO statute. But in pleading his state law claim, Keppel cites only to section 895.02(8)(b) of the Florida Statutes—the Florida criminal RICO statute. Not only is this state law claim insufficiently pleaded, section 895.05(6) limits the relief available for a private person to injunctive relief. See *Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1302 n.18 (11th Cir. 1998) (explaining that section 895.05(6) of the Florida criminal RICO statute "allows a private plaintiff to bring a civil suit for equitable relief only"). Florida courts have

interpreted 895.05(6) to permit both preliminary and permanent injunctions under certain conditions. See *Banco Indus. de Venezuela, C.A. v. Mederos Suarez*, 541 So. 2d 1324, 1326 (Fla. 3d DCA 1989). Although Keppel argues in his response to Defendants' motion to dismiss that "[t]he injunctive relief requested under [Florida law] is the correction of the false Internal Affairs reports that continue to damage [Keppel] by damaging his reputation and ability to find a job in law enforcement" and that he does not seek an injunction based on "employment practices," (Doc. 23 at 4), this argument fails. Federal Rule of Civil Procedure 8(a)(3) requires that a plaintiff plead a "demand for the relief sought." But Keppel does not mention injunctive relief anywhere in his Amended Complaint. (*See* Doc. 15).

Even if Keppel had requested injunctive relief, his Florida criminal RICO claim would also fail. Section 895.05(6) permits an injured party to bring a suit pursuant to section 895.05(1), which in turn permits injunctions of violations of provisions of section 895.03 of the Florida Statutes. Section 895.03 prohibits employees or associates of an enterprise to conduct the enterprise through a pattern of racketeering activity. Keppel alleges that the Defendants engaged in racketeering activity under section 895.02(8)(b), (Doc. 15 at ¶ 40), which defines racketeering activity as conduct defined as "racketeering activity" under 18 U.S.C. § 1961(1). As discussed above, Keppel does not sufficiently allege any predicate acts under § 1961(1). Further, "Florida's RICO statutes have consistently

been interpreted using federal RICO claims cases." *All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 745 (11th Cir. 1998). The federal standard for showing a pattern of racketeering—namely, through showing continuity—has been expressly relied on in Florida courts applying the Florida criminal RICO statute. *See State v. Lucas*, 600 So. 2d 1093, 1094 (Fla. 1992) (adopting the federal standard for continuity); *Lugo v. State*, 845 So. 2d 74, 99 (Fla. 2003). Thus, because Keppel fails to sufficiently allege either a closed- or open-ended pattern of predicate acts for purposes of his federal RICO claim, he also fails to sufficiently allege a pattern of predicate acts for his Florida RICO claim.

### iv.  Constitutional Claims

A generous reading of the Amended Complaint reveals allegations of violations of Keppel's constitutional rights under the First, Fifth, and Fourteenth Amendments.[10] (Doc. 15 at ¶¶ 41–46.) But because Keppel does not sufficiently state a claim upon which relief

---

[10] At the beginning of his Amended Complaint, Keppel explains that this action arises under the "Fourth, Fifth, and Fourteenth Amendment[s] to the United States Constitution" and in Count II, he mentions the First, Fifth and Fourteenth Amendments. (Doc. 15 at ¶ 2, 41–46.) No Fourth Amendment violation is pleaded in Count II, so the Court assumes it was an error. As for the Fifth and Fourteenth Amendment claims, Keppel provides only conclusory statements and wholly fails to support his conclusions with factual allegations. In the penultimate paragraph of Count II of his Amended Complaint, Keppel states that Defendants, in their official capacities, "denie[d Keppel] equal protection of the law in that the Defendants' conduct was arbitrary, oppressive and capricious and unreasonably required [Keppel] to submit to controls not imposed on other similarly situated Sheriff's Deputies" and "constitute[d] an unlawful and unauthorized taking of [Keppel's] job via forced resignation, his 'private property,' without just compensation, without due process of law, and without a public purpose, in violation of the [Fifth] Amendment." (*Id.* at ¶ 45.) And "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft*, 556 U.S. at 679.

can be granted, his constitutional claims fail. Specifically, as Defendants argue, "Keppel's Amended Complaint fails to allege how his constitutional rights were infringed/implicated by Defendants' alleged conduct." (Doc. 19 at 21.)

As for the First Amendment claim, Keppel alleges that "Defendants, in their official capacities, punished [Keppel] for exercising his First Amendment rights." (Doc. 15 at ¶ 43.) In his response to the Defendants' motion to dismiss, Keppel argues that he exercised his First Amendment rights when he directed his deputies not to participate in the ILP program and when he complained about his supervisors on social media. (Doc. 23 at 14.) Keppel fails to state a First Amendment claim premised on either of these statements because the directive to his deputies not to participate in the ILP program was not protected under the First Amendment and his complaint against his supervisors was not punished pursuant to a policy or custom, as required for municipal liability.

First, Keppel alleges he "instructed his deputies to ignore the directive of the Intelligence Led Policing [program] to harass alleged prolific offenders." (Doc. 15 at ¶ 24.) Because Keppel was giving a directive to "his deputies," Keppel alleges that he was, at that time, an employee of the Pasco County Sheriff's Office. As a public employee, Keppel has the right, "in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). To determine if a public employee's speech is protected under the First Amendment, a court must first determine

"whether the employee spoke as a citizen on a matter of public concern," and if yes, then the court must determine "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id.* at 418 (citation omitted). "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421. Determining whether an employee made a statement pursuant to the employee's official duties is a practical one. *See id.* at 424. In making this practical determination, a court should look at, among other considerations, whether the employee was "(1) speaking with the objective of advancing official duties; (2) harnessing workplace resources; (3) projecting official authority; (4) heeding official directives; and (5) observing formal workplace hierarchies." *Fernandez v. Sch. Bd. of Miami-Dade Cty., Fla.*, 898 F.3d 1324, 1332 (11th Cir. 2018).

Here, the Court has little difficulty determining that Keppel directed his deputies to ignore the ILP program "pursuant to [his] official duties." *Garcetti*, 547 U.S. at 421. Keppel alleges he was an employee of the Pasco County Sheriff's Office and, in alleging he gave a directive to his deputies, (Doc. 15 at ¶ 24), implies that he was a supervisor. And because Keppel implies he was a supervisor, he also implies that his duties were to oversee the police work of his subordinates. Thus, when Keppel directed his deputies to ignore a

workplace policy, he gave a "directive" as a supervisor to subordinates, "project[ed] official authority" and "observ[ed] formal workplace hierarchies." *Fernandez*, 898 F.3d at 1332. Moreover, he "harness[ed] workplace resources" insofar as he redirected the resources of the Sheriff's Office away from implementing the ILP program and toward other policing practices. *Id.* When Keppel directed his subordinates to ignore the ILP policy, he was acting pursuant to his official duties and such speech receives no First Amendment protection. *See Garcetti*, 547 U.S. at 421.

Keppel also argues in his response to the Defendants' motion to dismiss that he was punished for exercising his First Amendment rights when he "shared his frustrations about his supervisors on his social media account without naming any party involved." (Doc. 23 at 14.) But Keppel fails to allege or provide facts to support any theory of municipal liability for this "punishment." (*See* Doc. 15 at ¶¶ 41–46.) "A suit against a municipal officer in his official capacity is effectively a suit against the government entity that the officer represents." *Lopez v. Gibson*, 770 F. App'x 982, 991 (11th Cir. 2019). Thus, a suit against Defendant Nocco is effectively an action against the governmental entity that Defendant Nocco represents—here, Pasco County. *Id.*; *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1115 (11th Cir. 2005). An official policy or custom can manifest in several ways. For example, municipal liability may be premised on a single illegal act by a municipal officer—but only "when the challenged act may fairly be said to

represent official policy, such as when that municipal officer possesses final policymaking authority over the relevant subject matter." *Lopez*, 770 F. App'x at 991 (quotation omitted). And municipal liability exists only when there is a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Cook ex rel. Estate of Tessier*, 402 F.3d at 1116 (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see Lopez*, 770 F. App'x at 991.

Although Keppel argues that retaliating against employees for exercising their First Amendment rights is "the policy and custom of the Sheriff's Office," (Doc. 23 at 14), he does not identify in his Amended Complaint any factual allegations to support such a conclusory statement. His Amended Complaint is filled with cursory allegations that the Defendants retaliate against those who do not cooperate with the ILP program or who are not loyal to the "operational demands" of the Defendants. (Doc. 15 at ¶¶ 15, 21, 22.) But the Amended Complaint does not allege anywhere that the Defendants had a practice or custom of retaliating against employees for speech unrelated to the ILP program. And the speech Keppel alleges he engaged in on Facebook was discussing harassment from his supervisors for doing "too much" by performing traffic stops and "back[ing] up his [d]eputies." (*Id.* at ¶ 24.) If either of these are related to the ILP program, Keppel does not allege how. And in his response to the Defendants' motion to dismiss, Keppel does not allege any connection between the Facebook post and the ILP program, further

undermining any inference that the Facebook post was related to the program. (*See* Doc. 23 at 14.)

Because Keppel alleges only speech that was pursuant to his official duties and speech that was not subject to an alleged practice and custom of retaliation, Keppel's First Amendment claim fails.[11]

## V.   Conclusion

In total between the Squitieri litigation and here, Keppel has filed five complaints. And after quintuple chances, his Amended Complaint remains deficient and warrants dismissal for failure to state a claim upon which relief may be granted. Keppel received more than fair notice of his pleading defects yet rebuffed all warnings to remedy them.

---

[11] Keppel also alleges that the Defendants violated his right to free speech as guaranteed by the Florida Constitution. (Doc. 15 at ¶ 45.) "Pursuant to the Eleventh Amendment [of the United States Constitution], a state may not be sued in federal court unless it waives its sovereign immunity or its immunity is abrogated by an act of Congress under section 5 of the Fourteenth Amendment." *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011) (citing *Kimel v. Florida Bd. of Regents*, 528 U.S. 62 (2000)). "In order to constitute waiver of Eleventh Amendment immunity from suit in federal court, however, a state statute must employ language that is either explicit or else admits of no other reasonable interpretation." *Schopler v. Bliss*, 903 F.2d 1373, 1379 (11th Cir. 1990) (citations omitted). Keppel has not identified any statute that waives Florida's sovereign immunity for suits for damages brought in federal court on the basis of state constitutional violations. And Keppel would likely not be able to identify any. The Florida Supreme Court has previously noted that Florida is not exempt from "a challenge based on violation of the federal or state constitutions," *Dep't of Revenue v. Kuhnlein*, 646 So. 2d 717, 721 (Fla. 1994), *as clarified* (Nov. 30, 1994); but that case addressed a claim in Florida court and did not discuss Florida's immunity from suit in federal court on the basis of state constitutional violations. Because a "State does not waive its Eleventh Amendment immunity by consenting to suit only in its own courts," *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 306 (1990), the waiver identified in *Kuhnlein* is insufficient to waive Florida's immunity from suit in federal court. *See also Support Working Animals, Inc. v. DeSantis*, 457 F. Supp. 3d 1193, 1208 (N.D. Fla. 2020) (noting that the plaintiffs failed to establish that Florida waived Eleventh Amendment immunity to federal suits based on violations of the state constitution). This Court has not identified any proper waiver of Florida's Eleventh Amendment immunity against suits for damages in federal court based on state constitutional violations. Keppel's state constitutional claim fails.

Accordingly, the Court dismisses this case with prejudice. *See Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1296 (11th Cir. 2018); *Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1358 (11th Cir. 2018); *Cornelius v. Bank of Am., NA*, 585 F. App'x 996, 1000 (11th Cir. 2014).

Accordingly, it is **ORDERED**:

(1) Defendants' motion to dismiss Keppel's Amended Complaint is **GRANTED**. (Doc. 19.)

(2) The Court **DISMISSES WITH PREJUDICE** Keppel's Amended Complaint (Doc. 15) and **DISMISSES THIS ACTION**.

(3) The Clerk is directed to enter judgment in favor of Defendants, terminate any pending motions and deadlines, and to close the case.

**ORDERED** in Tampa, Florida, on September 24, 2021.

Kathryn Kimball Mizelle
United States District Judge